# Exhibit 2

# DECLARATION OF DAVID QUIMBY

I, David Quimby, declare as follows:

1. My name is David Quimby. I am over the age of eighteen and competent to make this Declaration. This Declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.
2. I am the named inventor of U.S. Patent Nos. 7,171,629 ("the '629 Patent"), 7,428,707 ("the '707 Patent"), 10,509,840 ("the '840 Patent"), and 10,909,204 ("the '204 Patent").
3. I am the founder, owner, and CEO of Adaptive Avenue Associates, Inc.
4. I earned a Bachelor of Arts degree in Economics with emphasis in mathematical economics and developmental economics from the University of California, Los Angeles in 1980 and I earned a Master of Business Administration with emphasis in organizational behavior and sociotechnical systems from the University of California, Berkeley in 1987.
5. From 1981 to 1983, I worked as a senior systems analyst in the electronic banking division of Bank of America, conducting analysis of business processes and conducting the planning, design, and implementation of financial analysis and planning systems. Between 1983 and 1985, I worked as a senior consultant in the advisory services group at Deloitte & Touche, conducting large-scale technical and economic feasibility analysis. During the early stages of my career in technology, I gained a passionate interest in the intersection between technology / human behavior

and technology / social systems, which led to my pursuit of graduate studies in that area.

6. From 1988 to 1990, following my graduate studies, I worked as a senior technology analyst at Stanford Research Institute (SRI). While there, I assisted in the conception and launch of inter-disciplinary, multi-client initiatives in distributed computing, hyper-distributed computing, and social computing. I had the good fortune to collaborate with Dr. Doug Engelbart, a pioneer in inter-active computing and a legendary innovator. Doug invented the graphical user interface (GUI) and other foundational elements of inter-active computing in his Augmentation Research Center (ARC) at SRI. Working with Doug, I gained a keen appreciation for human-centric design, and those principles became the foundation of my subsequent work in the computing arena.

7. Between 1991 and 1996, I returned to Bank of America as a technology planner and technology executive in the world banking division, eventually earning the corporate title of vice president. While there, I led the adoption of client-server architecture and an object-oriented development environment in an asset distribution group and I managed the phased implementation of a geographically-distributed operating platform. The unique business challenges of this complex business environment required the application of many of the advanced technologies in which I had gained expertise at SRI. This work brought me to the forefront of industrial applications of client-server architecture at the time.

8. After working at the forefront of client-server architecture for several years, the field gradually matured and became less adventurous. My interests turned to the emerging phenomenon of the World Wide Web. I left Bank of America and began the entrepreneurial pursuit of problems with the usability and navigation of the World Wide Web. It became clear to me that the conventional way of viewing information on the World Wide Web was limited. Web users had to expend too much attention and effort to navigate through a sequence of multiple Web pages or view search results. I recognized the need for a system that enables Web developers to provide an automated presentation of information in organized sequences without the cost of reprogramming site content. I also recognized the need for Web users to view presentations created by Web developers or create their own presentations of Web content without installing development tools.

9. In 1998, I founded Virtual Coast Associates, Inc. as a platform for incubating various Web-related opportunities. I intended the identity of Virtual Coast to have a double meaning: 1) not east coast / west coast, but "virtual" coast (focusing on "virtual" experiences) and 2) the "coast" (the edge, the frontier) of the virtual world.

10. In 2000, I founded Adaptive Avenue Associates, Inc. ("Adaptive Avenue") to commercialize the technology that forms the basis of the '629 Patent. I intended the identity of Adaptive Avenue to reflect my vision for the Web: the next generation of Web presentation is not an information superhighway – it's an adaptive avenue. Until that time, the Internet had been called an "information superhighway", with focus on speed and throughput of information. I was shifting the focus toward a

more personalized experience. At the time of embarking on this journey, the Web was barely emerging. The prominent search engine was AltaVista; although I referenced Google in my patent applications, it was obscure and barely known.

11. After founding Virtual Coast and Adaptive Avenue, I used my background, experience, and knowledge to conceive the invention described in the '629 Patent. The invention enabled developers to create Web slide show presentations of information in organized sequences without the cost of reprogramming site content; it enabled Web users to view presentations created by Web developers or create their own presentations of Web content without installing development tools.

12. I sought to overcome a technological problem by using server-side technology, without installing client-side technology, to create a slide show presentation on the World Wide Web. Although the World Wide Web, in its pre-existing client-server architecture, was adapted to flexibly serve individual Web pages, it was not adapted to serve sequences of Web content. The problems that I faced were not addressed by implementing existing methods of a slide show, photo slide show, or computer slide show presentation on the Web and they were not overcome by conventionally selecting various information sources to display.

13. Prior to my invention, the existing technology for viewing content on the World Wide Web was either monolithic (not granular and customized to the user's particular situation) or tedious and labor-intensive. A user could visit only a single Web page at a time and had to navigate the World Wide Web by repetitive pointing

and clicking. There was no way for a user to view Web content in a way that was both continuous and modular.

14. Likewise, although the existing technology at the time allowed for continuous presentation of information on the Web (*e.g.*, animation), it did not allow automated presentation of Web page content and it did not allow automated presentation without the cost of reprogramming site content or installing development tools.

15. I sought to provide a solution that included Web-development flexibility and seamless user experience over client-server architecture. I conceived a system and method that used components, such as a composer and a performer, to gather URLs and create a presentation of Web content. I also conceived a system and method that would address the problems rooted in the existing approach to continuous delivery of Web content. My invention that is encompassed in the ‘629 Patent therefore claimed a system and method that uses server-side processes to deliver Web content in a continuous and modular manner without client-side installation.

16. My intention was to create a fundamentally different Web presentation experience without re-architecting the underlying Web technology. It would run on the existing infrastructure while implementing a new experience layer. In this sense, I had the vision that the invention is not “high-tech” – it's “high-concept”. At a high level, the invention embraces three inventive concepts: 1) rotation of Web pages in organized sequences; 2) sequences of Web pages that can be organized “on the fly” – dynamically, at run time; and 3) use of a Web-service architecture and Extensible Markup Language (XML) to deliver this experience seamlessly without client-side

implementation. At the time of the invention, database-driven Web pages (individual Web pages constructed from a database dynamically, at run time) were just emerging. I envisioned that not only individual Web pages, but whole sequences of Web content, should be created on the fly.

17. The three inventive concepts are found in the claims. For example in claim 11, the rotation of Web pages in organized sequences is implemented in the combined limitations "establishing a list of URLs in said composer by one of a plurality of list establishment methodologies," "determining a display sequence of said list of URLs in said composer," and "automatically locally displaying the created presentation presented by said performer in a slide show format according to said list and said display sequence, wherein each of said plurality of URLs comprises a slide within said created presentation." Also in claim 11, the sequences of Web pages that can be organized "on the fly" – dynamically, at run time is implemented in the limitation "establishing a list of URLs in said composer by one of a plurality of list establishment methodologies the plurality of list establishment methodologies comprising manual entry via a user interface portion of the composer and automatic entry by a query-based system." Also in claim 11, the use of a Web-service architecture and Extensible Markup Language (XML) to deliver this experience seamlessly without client-side implementation is implemented in the limitation "remotely invoking a composer operating on a host server", limitations discussing the operation of the composer that is operating on the host server (*e.g.,* "creating a presentation in said composer, wherein said step of creating comprises the steps of:

establishing a list of URLs in said composer"; "determining a display sequence of said list of URLs in said composer"; "determining a duration of display for said list of URLs in said composer"), and the limitation "remotely invoking a performer operating on said host server to present said created presentation."

18. I encountered several problems in perfecting the invention and reducing it to practice. Initial prototypes employed a client-side module that required installation. This approach was not scalable, and I eventually solved the problem by replacing the client-side module with a parameter-driven JavaScript component running in the Web browser. I also encountered the problem of loading Web pages that disrupted the presentation process running in the browser window. Because I could not control the code within the Web pages that the sequence of Web pages contained, I solved the problem by running the presentation process in one browser window and launching the sequence of Web pages in a separate browser window. Some situations called for playing a partial Web page "nested" within another Web page instead of a full Web page. The partial Web page often served content that was hosted at a third party, not the owner of the full Web page. I solved the problem by playing the presentation in an "iframe" or internal floating frame. The underlying Web-service architecture responded successfully to this rather complex adaptation.

19. I authored a feature article in the July 2003 edition of *XML Journal* (Vol. 4 Issue 7) describing the emerging landscape of the Internet that required a solution like the invention claimed in the '629 patent. The cover of the *XML Journal* highlighted my article titled "Next Generation Web Presentation." A true and correct copy of the

cover of the July 2003 edition of *XML Journal* (Vol. 4 Issue 7) and my article are attached as Exhibit 2-1 to this declaration.

20. The commercial implementation of the claimed invention in the '629 patent that was developed, Adaptive Studio, received the endorsement of Dr. Doug Engelbart. Adaptive Avenue issued a press release on December 1, 2003, disclosing the endorsement of Dr. Engelbart. A true and correct copy of the archived press release is attached as Exhibit 2-2 to this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 2, 2021, in St. Paul, Minnesota.

David Quimby